**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ED&F CAPITAL MARKETS** | ) | |
| **LTD,** *et al.* | ) | |
| | ) | **No. 18 C 5704** |
| **Plaintiffs,** | ) | |
| | ) | **District Judge Steven C. Seeger** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **JVMC HOLDINGS CORP.** | ) | |
| **(f/k/a/ RJO HOLDINGS CORP.),** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs ED&F Capital Markets Ltd., ED&F Man Financial Services Holdings Ltd., and ED&F Man Financial Capital Markets MENA Ltd. (collectively "plaintiffs") brought this action against defendants JVMC Holdings Corp. ("RJO"), Gerald Corcoran, Jamal Oulhadj, and Daniel Staniford (collectively "defendants") for the alleged violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. and several counts of state law including breach of contract, breach of business relations, and unjust enrichment. (Dckt. #37). Plaintiffs and defendants are commodities and futures brokers who operate in over 60 countries. Plaintiffs allege that defendants used "bribery, theft, and deceit" to infiltrate plaintiffs' business in Dubai, United Arab Emirates in order to establish their own operation there. (*Id*. at ¶1). Currently before the Court are the motions to compel filed by both plaintiffs and defendants. For the reasons stated below, plaintiffs' motion to compel (Dckt. #120) is granted and defendants' motion to compel (Dckt. #112) is granted in part and denied in part.

1

## I.       Legal Standard

A party may file a motion to compel under Federal Rule of Civil Procedure 37 whenever

another party fails to respond to a discovery request or when its response is insufficient.

Fed.R.Civ.P. 37(a).  Courts have broad discretion in resolving such disputes and do so by

adopting a liberal interpretation of the discovery rules.  *Chicago Reg. Council of Carpenters v.*

*Pension Fund v. Celtic Floor Covering, Inc.*, 316 F.Supp.3d 1044, 1046 (N.D.Ill. 2018).  Federal

Rule of Civil Procedure 26(b)(1) provides that the "[p]arties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense." Fed.R.Civ. 26(b)(1); *see*

*also Motorola Sols., Inc. v. Hytera Communications Corp.*, 365 F.Supp.3d 916, 924 (N.D.Ill.

2019) ("Relevance focuses on the claims and defenses in the case, not its general subject

matter").  Discoverable information is not limited to evidence admissible at trial.  Instead, such

information is relevant "if the discovery appears reasonably calculated to lead to the discovery of

admissible evidence." Fed.R.Civ.P. 26(b)(1).

Nonetheless, "relevance alone does not translate into automatic discoverability under

Federal Rule of Civil Procedure 26."  *Motorola*, 365 F.Supp.3d at 924.  In particular:

> the discovery sought must not only be relevant, but it must be 'proportional' to
> the needs of the case, 'considering the importance of the issues at stake in the
> action, the amount in controversy, the parties' relative access to relevant
> information, the parties' resources, the importance of the discovery in resolving
> the issues, and whether the burden or expense of the proposed discovery
> outweighs its likely benefits.'

*Id*., quoting *Lechuga v. Magallanes*, No. MO:16-CV-00269-RAJ-DC, 2017 WL 8181556, at *1

(W.D.Tex. July 7, 2017).  Once the moving party has made a preliminary showing that "the

discovery it seeks is relevant to the case and proportional to the needs of the party," *Sanchez v.*

*City of Fort Wayne*, No. 118CV00397HABSLC, 2019 WL 6696295, at *2 (N.D.Ind. Dec. 9,

2019) (citing cases), "[t]he party opposing discovery has the burden of proving that the requested discovery should be disallowed." *Id.* (internal quotation marks omitted).

## II.      Plaintiffs' Motion to Compel

On May 8, 2020, the Court issued a memorandum opinion and order denying defendants' motion for a protective order that set out the factual allegations involved in this case. (Dckt. #154). As the Court stated, defendants began soliciting four of plaintiffs' key employees – Benji Chtromberg, Sayyed Hussain, Omar Khan, and Mark Smith[1] – to leave their employment and join defendants' Dubai office, RJO MENA [Middle East and North Africa]. After defendants responded to plaintiffs' document requests ("the Original Production"), defendants obtained new counsel in June and August 2019. Defendants' new attorneys determined that prior counsel had inadvertently produced documents that were both irrelevant and confidential. Accordingly, defendants provided plaintiffs with a replacement production on December 4, 2019 that redacted some of the previous materials and altered the confidentiality designations of a number of documents. ("the Altered Production"). An additional production of documents was made on December 18, 2019 (the "Supplemental Production"). The Supplemental Production included 18 documents, six of which were heavily redacted copies of defendant RJO's board minutes and presentations.

### A.      Defendants Must Produce Unredacted Versions of RJO's Board Minutes

Plaintiffs ask that defendants be required to turn over unedited versions of RJO's board minutes. Plaintiffs claim that these minutes were responsive to their Request Nos. 43 and 44, which sought documents and communications related to "Plaintiffs; the Diverted Trade,

---

[1] Plaintiffs label these four brokers as "the Corrupted Employees." The Court adopts defendants' less pejorative label of "the Relevant Brokers."

conception, formation, hiring, operating strategy and employee poaching for the RJO MENA office location; and this Action." (Dckt. #120, Ex. D at 15).

To illustrate what is at stake, plaintiffs have submitted three of the six board notes that defendants produced in redacted form:

1. An RJO board presentation dated February 7, 2018. This document contains 19 pages, 17 of which are entirely redacted. One page contains the statement: "Sales & Business Development [REDACTED] & Dubai." Another page states that RJO interviewed 16 brokers, hired five of them, and placed the Relevant Brokers under contract for starting dates of April 1 and May 15, 2018. (*Id*. at Ex. F).

2. RJO board meeting minutes for April 25, 2018. This document contains six pages. Four pages are fully redacted; one identifies the persons present at the meeting; and one contains substantive material concerning defendants' due diligence on the brokers' hiring, the marketing required to acquire accounts, and start-up plans for the Dubai office. (*Id*. at Ex. G).

3. RJO board meeting minutes for July 26, 2019. This document also contains six pages. Four are redacted; one announces the meetings' participants; and one states that RJO MENA currently had more brokers than anticipated and that its budget was "currently behind due to the delayed onboarding of one broker." (*Id*. at Ex. H).

Defendants argue that they were entitled to redact all six of the documents in dispute before producing them to a competitor because of their irrelevance and confidentiality. The Court disagrees. As the Court found in its May 8, 2020 memorandum opinion, the parties' November 15, 2019 Amended Confidentiality Order permits defendants to designate any highly-sensitive documents as "confidential – for attorney's eyes only" if their disclosure would "result in a defined and serious injury." (Dckt. #31 at ¶3). The Court does not reiterate its reasoning

4

here; instead, it finds that the Amended Confidentiality Order fully protects defendants' sensitive information for the reasons the Court explained in its prior order. (Dckt. #154 at 7-9).

As in their earlier motion for a protective order, defendants also place great stress on the claim that parties are entitled to redact irrelevant information from responsive documents and cite a series of cases to that effect. The Court expressed its agreement with that general conclusion, (*id*. at 6), but found that it did not apply to defendants' earlier motion. It also has no application here. The cases that defendants rely on found that a party could redact material based on relevance only after the court undertook an *in camera* review of the disputed documents. *See RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209 (N.D.Ill. 2013); *Beauchem v. Rockford Prod. Corp*., No. 01 C 50134, 2002 WL 1870050 (N.D.Ill. Aug. 13, 2002). By contrast, defendants have not submitted *any* of the materials they redacted. The Court therefore cannot find that the removed information is irrelevant to the claims or defenses in this case.

That said, defendants claim that everything that they removed was both irrelevant *and* confidential. The Amended Confidentiality Order is therefore sufficient to protect all the redactions that defendants have made. Defendants are instructed to provide unredacted version of the board minutes in question to plaintiffs within 7 business days of the issuance of this order.

### B. Plaintiffs Must Respond to Document Request No. 1

In addition to hiring the Relevant Brokers, defendants also recruited non-parties Paul Whetstone and Brad Hart from the firm of Tullett Prebon ("the Tullett Brokers"). Request No. 1 in plaintiffs' document requests asked defendants to turn over "[a]ll documents and communications related to RJO's and/or Defendants' efforts to recruit Paul Whetstone and/or Bradley Hart, including any related communications between You and Tullett Prebon." (Dckt.

#120, Ex. B at 6).  Defendants objected to the request on several grounds but responded in detail to its relevance as follows:

> Efforts to recruit Paul Whetstone and Bradley Hart to join [RJO MENA] and any related communications between Defendants and Tullett Prebon were not relevant to Plaintiffs' claims in this case because Paul Whetstone and Bradley Hart were not employed by Plaintiffs when they were recruited to join RJO MENA, and Plaintiffs have alleged no claim, nor could they allege any claim, arising from or related to the recruitment of Paul Whetstone and Bradley Hart to join RJO MENA.

(*Id.*).[2]

Plaintiffs argue that their request is relevant based on an October 23, 2017 email from defendant Staniford to RJO's marketing head Mark Sachs.  The email inquired about defendants' due diligence inquiry into Tullett Broker Brad Hart and Relevant Broker Sayyed Hussain, neither of whom had yet resigned their former employment and signed on with defendants.  The email also mentions "the specific relationships" that the brokers would be "onboarding" to RJO and the revenues that might be generated by those relationships.  Staniford then wrote – somewhat unclearly – as follows:

> Contracts out but no signatures yet – not economic issues at this point but some small detail to be ironed out this week.  Concerns run high on tullet's [sic] ability and desire to pursue action – if the prospect account by detail is not mission critical then I would elect to leave it be for [P]aul [Whetstone] and [B]rad – we have their volumes ltm [sic] and they confirm (actually outperform) my initial expectations[.]
>
> As for [S]ayyed I can run this down in 48 hours so should not be a problem[.]

(*Id.*, at Ex. C at 2).

---

[2] Defendants claim in their response brief that the absence of a formal allegation in the First Amended Complaint concerning the Tullett Brokers means that information about them would not be relevant under Federal Rule of Evidence 401.  Even if defendants were correct about this (and the Court does not decide the issue one way or the other), it does not matter: "[a]t this stage the Court is only concerned with relevance under Federal Rule of Civil Procedure 26(b)(1), not relevance and admissibility under Federal Rule of Evidence 401."  *Laudicina v. City of Crystal Lake*, 328 F.R.D. 510, 519 (N.D.Ill. 2018).

Plaintiffs argue that Staniford's "concerns" about Tullett's willingness "to pursue action" about Hart's prospective accounts suggests "a consciousness of guilt" about how defendants were recruiting all the brokers. Since Staniford was unwilling to pursue information from the Tullett Brokers but not Hussain, Request No. 1 would allegedly cast light on "Plaintiffs' claims that Defendants knowingly, willfully, and intentionally misappropriated Plaintiffs' Confidential Information and induced the [Relevant Brokers] to violate contractual and fiduciary duties owed to Plaintiffs." (Dckt. #120-1 at 11). Plaintiffs contend that makes communications about the Relevant Brokers relevant to (1) plaintiffs' intentional tort claims and (2) defendants' affirmative defense of "fair competition." The Court agrees concerning the affirmative defense and therefore does not address plaintiffs' tort allegations.

Both the corporate and the individual plaintiffs stated as their First Affirmative Defense that plaintiffs' claims – including the tort of an intentional interference with business relations – are barred "because Defendants acted with justification at all relevant times, consistent with fair competition, for a legitimate business purpose in furtherance of their own lawful interests and by means that are lawful." (Dckt. #42 at 45; Dckt. #104 at 28). It is well established that Illinois law permits a defense of fair competition against the tort of intentional interference with business relations. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003) (stating that "a defendant may have a privilege to compete that defeats an action for intentional interference with prospective business advantage") (citing *Soderlund Bros., Inc. v. Carrier Corp.,* 663 N.E.2d 1, 8 (Ill.App.Ct. 1995)). The defense is restricted by the nature of the defendant's actions, however, so that "the competitor's privilege is not available to those who use wrongful means to interfere" – including fraud, deceit, intimidation, or deliberate disparagement. *Foboha GmbH v. Gram Tech., Inc.*, No. 08 C 0969, 2008 WL 4619795, at *5

(N.D.Ill. Oct. 15, 2008) (internal quotes and citation omitted); *see also Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 893 N.E.2d 981, 994 (Ill.App.Ct. 2008).

Request No. 1 is relevant to this affirmative defense, though the issue is more complex than plaintiffs state. The October 2017 email clearly conveys Staniford's concern that Tullett Prebon was willing and able "to pursue action" against defendants – a worry that did not apply to plaintiffs.[3] His anxiety was serious enough for him to back away from obtaining information from Hart but did not prevent him from approaching Hussain. Plaintiffs claim that the email shows Staniford's "consciousness of guilt," but that overstates what the emails says. Staniford was clearly concerned about *something*. It is unclear, however, if that involved a fear of being caught in wrongdoing or was merely the type of reasonable worry that might be part of one company's attempt to recruit important employees from another – perhaps unusually aggressive – competitor.

At his deposition, Staniford attempted to show that the second explanation was the basis of the email. He testified – repeatedly – that his real worry was "about everyone's well-being and everyone's restrictive covenants" and therefore wanted to ensure that all parties involved in the recruitment were "going at it by the book." (Dckt. #128, Ex. A at 4). Even accepted as true, that does not explain why Staniford was worried about "action" from Tullett Prebon but not from ED&F MENA about Hussain's recruitment. Plaintiffs claim that – just like the Tullett Brokers – the Relevant Brokers were also bound by restrictive covenants that were still in effect when the email was written. Indeed, one of plaintiffs' key allegations is that defendants knew that the

---

[3] Defendants object that plaintiffs already know from defendants' discovery responses that Tullett Prebon did not take any legal action against them. Defendants' responses, however, were made on October 9, 2019, (Dckt. #120, Ex. B at 10), two years after Staniford's October 2017 email. The relevant issue is what Staniford was concerned about when he wrote the email. The communication is cryptic in some regards, but it strongly implies that Staniford was anxious about the possibility of litigation ("[c]oncerns run high on tullet's ability and desire to pursue action").

8

Relevant Brokers were breaching their contractual obligations and had already obtained confidential information from them.  (Dckt. #37 at ¶¶ 40-42, 65).  Staniford did not explain why his concern about "everyone's restrictive covenants" caused him to back off from the Tullett Brokers but not Hussain.  To the contrary, his willingness to "run down" the same information with Hussain that he would not pursue from Whetstone suggests – though it certainly does not prove, as plaintiffs imply – that Staniford may have formed different kinds of relationships with these prospective recruits that made him less concerned about potential legal action from plaintiffs than from Tullett Prebon.

The issue would be clearer if the October 2017 email stated what it was that Staniford was trying to find out from these two sets of brokers.  The email is vague, however, and Staniford said at his deposition that he could not recall what it was that he intended to "run down" with Hussain.  (Dckt. #145, Ex. E at 17).  He was also unclear what he meant by "prospect account by detail."  Staniford initially stated that he did not recall what that phrase meant.  He then said that it ordinarily referred to accounts that he could "onboard and assign to brokers" but that its meaning in the context of the October 2017 email was protected by the attorney-client privilege.  (*Id.* at 14-16).  Staniford's intent became even more uncertain at the close of the deposition when he conceded after detailed questioning that he could not provide any explanation of the email's meaning:  "I don't remember crafting this email or what transpired after.  *So I'm not going to guess as to what my thoughts were at the time.*"  (*Id*. at Ex. F at 15) (emphasis added).

Despite Staniford's disavowal of the email's meaning, three points are clear:  (1) the e-mail draws a nexus between the Tullett Brokers, the Relevant Brokers, and defendant Staniford; (2) it implies a serious concern about litigation from Tullett but not from plaintiffs; and (3)

Staniford stated a willingness to act more freely with Husain than with the Tullett Brokers. The email does not appear to be direct evidence of wrongdoing (as plaintiffs claim), but it shows enough unaccounted connections between the recruitment of the Tullett Brokers and the Relevant Brokers to make it relevant to defendants' "fair competition" defense. !

Defendants' remaining objections are overruled. Defendants claim that Request No. 1 is overly broad and would lead to additional discovery requests concerning every broker that defendants have hired. To the contrary, the request is limited in scope and time: it only concerns two individuals and a brokerage firm with whom defendants allegedly had communications over a limited period of time. Plaintiffs state that the Tullett Brokers have a special significance to their claims, moreover, and nothing supports an inference that a cascade of additional discovery would ensue by requiring defendants to answer Request No. 1. Indeed, plaintiffs expressly disavow any intent to seek such broad discovery.

Plaintiffs' motion is granted as to this issue. Defendants are directed to respond to Request No. 1 within fourteen (14) days of the issuance of this order.

### III.    Defendants' Motion to Compel

On February 21, 2020, defendants filed their motion to compel seeking the disclosure of additional information concerning plaintiffs' alleged trade secrets, evidence related to several categories of the damages that plaintiffs claim they have suffered, and documents relevant to plaintiffs' broker recruitment and termination practices. Plaintiffs subsequently produced a number of additional documents that they claim have rendered some of defendants' requests moot. The Court has accounted for those submissions as addressed below and finds that defendants' motion should be granted in part and denied in part.

10

### A.    Plaintiffs Should Respond to Interrogatories Concerning Trade Secrets

In their Interrogatory No. 1, defendants asked plaintiffs to identify "any trade secret or confidential information" that plaintiffs alleged had been misappropriated by defendants.  (Dckt. #112 at Ex. A).  This included information related to plaintiffs' "specialized software system" for executing trades that plaintiffs claim defendants learned about "through the bribery of Plaintiffs' employees."  (Dckt. #37 at ¶22).  Along similar lines, Interrogatory No. 8 asked plaintiffs to identify "each 'trade secret' You allege was misappropriated."  (Dckt. #112 at Ex. B).  Plaintiffs objected that discovery was ongoing for both requests; that some of the relevant information was already in defendants' possession; and that "at the very least" the trade secrets could be identified by a range of specific production documents that plaintiffs identified by bates numbers and broad descriptions such as "client lists," "compensation and bonus structure," and "rate information."  (*Id*.).

These responses fail to satisfy plaintiffs' discovery obligations.  By their own admission, the categories of trade secrets that plaintiffs identify in their responses are only representative examples of those that could be at issue in this case.  Rule 33, however, states that a responding party must answer interrogatories "*fully* in writing under oath."  Fed.R.Civ.P. 33(b)(3) (emphasis added); *see also Equal Rights Ctr. v. Post Properties, Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007) ("A party to whom an interrogatory is propounded must provide true, explicit, responsive, complete, and candid answers.") (internal quotes and citation omitted).  Plaintiffs claim that they are not required to do more than provide examples of trade secrets, (Dckt. #127 at 4), but "[t]he requirement is that [a party] needs to be exhaustive, not just provide examples."  *Remy Inc. v. Tecnomatic, S.P.A.*, No. 1:11-CV-00991-SEB, 2013 WL 1331002, at *2 (S.D.Ind. Mar. 28, 2013).  As defendants point out, moreover, the plaintiff in a trade secrets case "bears the burden

of identifying its trade secrets with specificity." *IDS Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583-84 (7th Cir. 2002).[4]

Plaintiffs also object to responding in full to Interrogatories No. 1 and 8 on the ground that much of the information that defendants seek is already in their possession in one form or another. Even if that is true, plaintiffs cannot decline to respond to these requests on the ground that defendants might be able to ferret out what they are asking for by some other means. "A party is not prevented from obtaining an interrogatory response just because the information requested by the interrogatory is similar to other discovery already obtained." *Beijing Choice Elec. Tech. Co. v. Contec Med. Sys. USA Inc.*, No. 18 C 0825, 2020 WL 1701861, at *6 (N.D.Ill. Apr. 8, 2020). Defendants point out that 31,000 pages of documents have already been produced in this case. The burden for identifying the parts of that production that contain responsive information falls on plaintiffs as the answering party – not on defendants.

The Court also agrees with defendants that plaintiffs must do more than identify a list of documents that contain the information that defendants are seeking. They must also provide a narrative response to these interrogatories that provides the information that is sought. Plaintiffs appear to believe a written response is unnecessary because the relevant documents generally consist of email communications with attachments "that contain information readily identifying as trade secrets." (Dckt. #127 at 5). Defendants, however, are not required to guess what parts of the email attachments contain trade secrets. Plaintiffs shall therefore provide a written response that responds in full to Interrogatories Nos. 1 and 8.

---

[4] Plaintiffs assert that they may uncover more trade secrets that defendants have misappropriated during the course of discovery. However, this possibility does not relieve plaintiffs of their obligation to fully identify the allegedly misappropriated trade secrets of which they are now aware. If plaintiffs learn of any additional trade secrets that they believe were misappropriated, they must supplement their discovery responses as required by Rule 26(e).

### B. Damages Discovery

Defendants also submitted a number of interrogatories and document requests related to several aspects of the damages that plaintiffs claim they have suffered. These include: (1) information concerning the loss of plaintiffs' trading commissions, (2) plaintiffs' increased costs to retain their employees, and (3) various requests concerning plaintiffs' claim that they experienced a "diminution in the value of their business" due to defendants' alleged wrongdoing. (Dckt. #37 at ¶7). The Court addresses each of these issues in turn.

### 1. Plaintiffs must provide their trading loss calculations

Defendants first identify three categories of discovery on plaintiffs' trading losses that they argue require additional responses from plaintiffs: (1) losses related to trades that the departing brokers would have transacted had they not left their employment (Document Request No. 28; Interrogatory No. 8); (2) the identity of each customer involved in plaintiffs' losses, the amount of the loss, and the method used to calculate it (Interrogatory No. 5); and (3) information concerning the performance and forecasts for plaintiffs' futures and financial desks in Dubai (Document Requests Nos. 7-8, 13, 15).

In their response, plaintiffs state that they have produced all the documents in their possession that demonstrate their lost trading commissions and that they did so in the manner in which those documents are kept in the ordinary course of business. Plaintiffs add, however, that they are now able to produce the same data to defendants in a form that provides a more "granular" view of their losses. Furthermore, plaintiffs claim that they will also turn over documents related to their trading desks but that no documents exist concerning their cost of capital or the profitability of the departing brokers. (Dckt. #127 at 8-9). Defendants do not dispute the adequacy of these documents in their reply brief; instead, they only pursue arguments related to their damages-related interrogatories. (Dckt. #137 at 6-7). The Court therefore finds

that plaintiffs have adequately responded to Document Requests Nos. 7-8, 13, 15 and 28. Defendants' motion is denied on these requests.

That said, plaintiffs claim in another part of their response that they should not be required to quantify all of their trading losses until expert discovery is completed. Plaintiffs concede that they have made "preliminary damages calculations," (Dckt. #127 at 13), but cite *United States ex rel. Tyson v. Amerigroup Ill., Inc*., 230 F.R.D. 538 (N.D.Ill. 2005) to argue that they should not have to provide that information at this time. The Court disagrees that *Tyson* supports plaintiffs' position. Unlike here, the interrogatory in dispute in *Tyson* did not ask for a party's damage calculations. Instead, it sought a detailed description of the opposing party's "*theory* or theories and method or methods for calculating damages." *Id*. at 540 (emphasis added). The court found – and this Court agrees – that involves an issue best left to expert discovery where the methods for calculating damages can be set out in appropriate detail. By contrast, plaintiffs are only being asked to turn over the damages calculations they admit they have already made. Those calculations are relevant, and plaintiffs must produce them. *See Sauer v. Exelon Generation Co., LLC*, No. 10 C 3258, 2011 WL 3584780, at *9 (N.D.Ill. Aug. 15, 2011) (ordering the disclosure of damages calculations prior to the closure of expert discovery). Defendants' motion is granted on this issue.

### 2. Plaintiffs should disclose some, but not all, of the costs required for retaining employees at this time

Defendants also propounded a number interrogatories and documents requests concerning the increased costs that plaintiffs incurred in trying to retain those employees who did not leave them to join defendants' Dubai operation. Defendants cite two distinct categories of discovery requests that, unfortunately, plaintiffs do not distinguish between in their response.

### a.    Interrogatory No. 6

Interrogatory No. 6 asked plaintiffs to identify the current and former employees for whom plaintiffs allege damages due to increased retention costs, together with the amount of damages associated with them.  Plaintiffs responded to the first part of the request by identifying (1) the four Relevant Brokers and (2) six retained brokers.  Plaintiffs did not identify any amount of damages for any of these employees.  (Dckt. #112 at Ex. B).

Plaintiffs specifically allege in their amended complaint that they were required to raise the salary of six employees who did not leave with the Relevant Brokers and gave them "an extraordinary bonus."  (Dckt. #37 at ¶67).  Those six employees are presumably the six retained brokers identified in plaintiffs' interrogatory response.  Plaintiffs must therefore identify the bonus and pay raises associated with these six brokers within fourteen (14) days of the entry of this order.  This is not a complex calculation, and it does not take an expert to determine the amount of a bonus or a salary increase.  Insofar as other damages claims may be related to any of the employees that plaintiffs identified in response to Interrogatory No. 6, the Court agrees with plaintiffs that any further disclosure should be reserved for expert discovery.

### b.    Plaintiffs are not required to respond to requests concerning brokers in comparable positions

Defendants also issued a series of supplementary requests seeking documents regarding policies, compensation, and incentive plans for plaintiffs' brokers who did not leave their employment.  (Second Document Request No. 5; Third Document Request No. 9, 14, 34). Plaintiffs responded that they would produce documents for the departing brokers (Requests No. 5 and 14) but that the requests were otherwise irrelevant and disproportionate to the needs of the case.

The Court agrees that plaintiffs are not required to respond further to these document requests. Under Rule 26(b)(1), discovery must be relevant *and* proportional to the needs of a case – a requirement that involves two prongs that must both be satisfied. *See*, *e.g.*, *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 321 F.R.D. 250, 279 (N.D.Tex. 2017) (citing cases). Defendants claim these requests are relevant because responsive documents would test plaintiffs' claim that the increased costs associated with the retained brokers identified in Interrogatory No. 5 were proximately caused by the need to prevent their recruitment by defendants. The best test for that issue, however, is discovery directly related to the brokers that plaintiffs have identified. Even if the requests were relevant, moreover, defendants have not addressed plaintiffs' objection that they are disproportionate to the case. "Relevancy alone is no longer sufficient – discovery must also be proportional to the needs of the case." *In re Bard IVC Filters Prod. Liab. Litig.*, 317 F.R.D. 562, 564 (D.Ariz. 2016). Defendants overlook that plaintiffs operate on a world-wide basis and that their discovery requests concern more than 100 other brokers. (Dckt. #127 at 11-12). Thus, information on incentive plans, commissions schedules, and other policies related to *all* comparable brokers goes far beyond the six retained brokers that plaintiffs claim are relevant to their damages claims. The Court agrees that these particular requests are not proportionate to the needs of the case and defendants' motion is therefore denied as to this set of document requests.

### 3. Plaintiffs are not required to provide consultant documents concerning plaintiffs' business harm

#### a. Document Request No. 4

In their Third Document Request No. 4, defendants asked plaintiffs to produce documents related to facts or analyses prepared by plaintiffs' "consultants or advisors, regarding the estimated impact of this litigation" on plaintiffs' business operations. That included an

16

estimate of plaintiffs' damages related to the alleged harm to plaintiffs' business reputation. (Dckt. #112 at Ex. C).  Plaintiffs responded by claiming that such documents were protected by the attorney-client privilege and/or the work product doctrine.

The Court agrees that documents prepared by plaintiffs' litigation consults are protected by the work product doctrine and are not discoverable.  Federal Rule 26(b)(3)(A) states that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Courts have interpreted this to mean that "[w]hen experts serve as litigation consultants, the work-product privilege generally applies to materials reviewed or generated by them in that capacity."  *S.E.C. v. Reyes*, No. C06-04435 CRB, 2007 WL 963422, at *1 (N.D.Cal. Mar. 30, 2007).

Defendants note, however, that plaintiffs have not included the documents they claim are privileged in their privilege log.  Plaintiffs are directed to remedy that oversight by including all the documents that are responsive to Request No. 4 in an amended privilege log showing "the date, the author and all recipients, along with their capacities, the subject matter of the document, the purpose for its production and a specific explanation of why the document is privileged." *RBS Citizens*, 291 F.R.D. at 218.

### b.  Document Request No. 2

In addition to Request No. 4, defendants' motion also asks plaintiffs to respond to Third Document Request No. 2, which sought documents on communications that plaintiffs had with past or present lenders, acquirors, new hires, or "the public" concerning ED&F MENA's financial condition or any allegation that plaintiffs have made in this case.  (Dckt. #112 at Ex. C).

Unfortunately, plaintiffs overlook this document request in their response, and defendants ignore it in their reply. (Dckt. #127 at 10; Dckt. #137 at 7-8). On January 16, 2020, however, plaintiffs sent defendants a letter concerning the parties' discovery disputes that included these third-party communications. Plaintiffs reiterated their original response to Request No. 2 that any third-party communications concerning plaintiffs' allegations were already included in plaintiffs' prior document production. (Dckt. #112 at Ex. G). Defendants complain in their motion that they have been unable to locate these documents. Plaintiffs are therefore directed to identify the bates numbers of the documents they produced that are responsive to this aspect of Request No. 2.

The January 16, 2020 letter does not clarify plaintiffs' objections to producing third-party communications related to ED&F MENA's financial condition. Plaintiffs' original discovery response objected that (1) plaintiffs had already produced documents on their financial condition, (2) not all third-party communications on this issue were relevant to the case, and (3) the attorney-client privilege and work product doctrine protected at least some communications. The Court agrees that requiring plaintiffs to turn over *all* communications on ED&F MENA's financial condition is overly broad. However, communications that concern plaintiffs' allegation that their financial condition was harmed by the Relevant Brokers' departure are relevant to their claims. Plaintiffs are directed to produce documents that are responsive to that issue to the extent that they have not been produced already. Insofar as plaintiffs have already produced them, they should identify these documents to defendants by bates numbers. Any relevant documents that plaintiffs believe are protected by a privilege should be included in the amended privilege log. [5]

---

[5] The Court has addressed the business harm issue by assuming that the documents sought in Requests No. 2 and 4 are defendants' primary concern because this section of their reply brief is exclusively

### C. Plaintiffs are not required to respond to requests concerning recruitment or termination policies

Defendants submitted numerous interrogatories and document requests related to plaintiffs' recruitment and termination practices. (Second Document Requests No. 2-3; Third Document Requests No. 1, 6, 31; Second Interrogatories No. 4, 9). They seek information such as plaintiffs' communications with brokers who work for other competitors, their "onboarding" of other firms' customers, and issues related to the termination of plaintiffs' employees.

Defendants contend that documents concerning the termination or departure of other brokers – including plaintiffs' employee "headcount" over time – would show the Relevant Brokers' "true motive" for leaving their employment with plaintiffs. The Court disagrees with this reasoning because the obvious source for discovering the Relevant Brokers' motive is the brokers themselves, and defendants have not shown why additional discovery is needed on this issue. In addition, only two of the seven requests that defendants cite in their motion actually concern termination or departure issues: Third Document Request No. 31 asks for documents on "any and all" employees whom plaintiffs terminated; Second Interrogatory No. 9 asks for the names and contact information for all ED&F MENA employees who left their employment after January 1, 2015. (Dckt. #112 at Exs. C & F). These requests are neither relevant nor proportional to this case. The termination and/or departure of plaintiffs' other employees is not at issue in plaintiffs' amended complaint. Contrary to defendants' claim, moreover, requests involving the termination of "any and all" of plaintiffs' employees would show nothing about plaintiffs' "headcount" or why the Relevant Brokers left their employment.

---

concerned with the production of such documents and addresses arguments that plaintiffs made about Request No. 4.

Defendants expand on these termination issues by also seeking information on various aspects of plaintiffs' business operations such as the "onboarding of new customers" (*Id.*, Ex. C at Req. 1), employment agreements that plaintiffs entered into with newly-hired employees (*Id.*, Ex. E at Req. 3), and the entities from whom plaintiffs' hired employees who were already bound by agreements with their former employers.  (*Id.* at Ex. F at Int. 4).  Defendants claim that these issues are relevant to their "fair competition" defense addressed earlier, *supra* at Section II(B), because discovery would show that plaintiffs engaged "in the exact same conduct" that defendants are alleged to have done.  (*Id.* at 15).  That is, defendants suggest that plaintiffs' recruitment practices have given them "unclean hands" that is relevant to the fair competition defense – though defendants do not explain what that relevance is.

Defendants' motion is denied as to these requests.  Even if plaintiffs engaged in the practices that defendants suggest, the requests have no relevance to a claim or defense in this case.  They are clearly unrelated to plaintiffs' own claims.  The requests are also irrelevant to defendants' affirmative defenses, which do not include a defense of unclean hands.  As for fair competition, defendants do not cite any authority for the proposition that an opposing party's misconduct with unrelated third parties has any bearing on such a defense.  Furthermore, it is well established that "unclean hands" cannot be invoked when it concerns third-parties who are unconnected to the transactions at issue in a lawsuit.  *See Zahl v. Krupa*, 850 N.E.2d 304, 309 (Ill.App.Ct. 2006) ("The doctrine of unclean hands applies if a party seeking equitable relief is guilty of misconduct, fraud, or bad faith toward the party *against whom relief is sought* and if that misconduct is *connected with the transaction at issue* in the litigation.") (emphasis added).

Defendants' motion to compel is granted in part and denied in part. Plaintiffs shall respond to those parts of the motion that are granted within fourteen (14) days of the entry of this order.

## CONCLUSION

For the reasons stated above, plaintiffs' motion to compel (Dckt. #120) is granted and defendants' motion to compel (Dckt. #112) is granted in part and denied in part.

ENTER:

**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: June 25, 2020**